UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

JAMES HEPNER,                                      :
                                                   :
              Plaintiff,                           :
       v.                                          :          No. 5:14-cv-05986
                                                   :
DENNIS MOLYNEAUX;                                  :
KENNETH ARNOLD; JARVIS LEWIS,                      :
also known as GERVAIS LEWIS, also known as         :
JOHN DOE; MARY CLARY;                              :
LANCASTER COUNTY PRISON BOARD,                     :
                                                   :
              Defendants.                          :

———————————————————————

**<u>MEMORANDUM OPINION</u>**

**Defendants' Motion for Summary Judgment, ECF No. 14 - Granted**

**Joseph F. Leeson, Jr.**                                    **February 1, 2016**
**United States District Judge**

**I.      Introduction**

On October 25, 2012, Plaintiff was incarcerated at the Lancaster County Prison in

Lancaster, Pennsylvania.[1] Plaintiff was in his cellblock, playing cards with his fellow inmates,

when he was approached by Matthew Longenecker, another inmate. Longenecker said to him,

"Oh, I heard you said something about me," to which Plaintiff responded, "I don't know who

you are, I didn't say nothing about you."[2] Unsatisfied with that response, Longenecker replied,

"Well, come up to my cell and we'll find out what you said."[3] Plaintiff refused the invitation and

returned to his card game. Approximately eight to twelve minutes later, Plaintiff left the game

---

[1]      The following account, taken from Defendants' Statement of Facts in Support of Their Motion for
Summary Judgment, ECF No. 15 [hereinafter "Defs.' Facts"], is not in dispute. <u>See</u> Pl. Resp. to Defs. Facts ¶¶ 6-14,
ECF No. 16.
[2]      Defs.' Facts ¶ 6.
[3]      <u>Id.</u> ¶ 7.

1

and headed to his cell to prepare to take a shower. After entering his cell, Plaintiff was surprised to discover Longenecker standing behind him in the cell with the cell door closed. Longenecker said, "I heard you called me gay."[4] Plaintiff responded, "I don't even know you" and made for the door.[5] But before he could get there, Longenecker "sucker punched" him in the area of his left eye. Longenecker hit him two more times—at least once again on the left side of his face— before Plaintiff was able to exit his cell. A correctional officer then separated the two men.

Plaintiff claims the attack seriously injured his left eye, causing him to suffer a posterior vitreous detachment of his retina and associated symptoms and increasing his risk of developing macular degeneration and other degenerative conditions. See Compl. ¶ 25. He filed this suit against Dennis Molyneaux, the Warden at the time of the incident, Kenneth Arnold, the Deputy Warden, Mary Clary, a counselor at the prison, and the Lancaster County Prison Board. In his single-count complaint, he alleges that each of the Defendants violated his Eighth Amendment rights in violation of 42 U.S.C. § 1983 by failing to protect him from Longenecker.[6] Defendants now move for summary judgment. Because there is no genuine dispute of fact that Defendants did not violate Plaintiff's Eighth Amendment rights, Defendants' motion is granted.

## II.    Legal standards

## A.    Motion for summary judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[4]    Defs.' Facts ¶ 11.
[5]    Id.
[6]    Plaintiff also named a prison guard as a defendant, whom Plaintiff identified as either "Jarvis Lewis," "Gervais Lewis" or "John Doe."  See Compl. ¶ 4. Plaintiff may have intended to name "Jamerson Lewis," a former correctional officer the parties deposed in connection with this case, but discovery closed over seven months ago, and Plaintiff neither effected service upon this defendant nor sought to amend his complaint to substitute the defendant's actual name. Accordingly, this defendant is now dismissed. See Blakeslee v. Clinton Cty., 336 F. App'x 248, 250-51 (3d Cir. 2009) (affirming a district court's decision to dismiss a series of John Doe defendants that remained nameless at the time the court ruled on the named defendants' motion for summary judgment).

Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id. When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**B.      Eighth Amendment – The right to be free from cruel and unusual punishment.**

The Eighth Amendment guarantees the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. The constitutionality of a prisoner's punishment is not measured only by the length of the sentence, but also by "the treatment [the] prisoner receives in prison and the conditions under which he is confined." See Farmer v. Brennan, 511 U.S. 825, 832 (1994). A prisoner's right to be free from cruel and unusual punishment therefore "places restraints on prison officials," who "must 'take reasonable measures to guarantee the safety of the inmates.'" Id. at 832-33 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). Among those constitutional responsibilities is the "duty . . . to protect prisoners from violence at the hands of other prisoners," id. at 833 (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988) (Breyer, J.)), because "[b]eing violently assaulted is simply not 'part of the penalty that criminal offenders pay for their offenses against society,'" see id. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

However, the Eighth Amendment is not violated whenever an inmate is harmed by another. See id. at 834. The failure to protect an inmate from violence at the hands of another inmate only crosses the constitutional line if the inmate can show that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citing Farmer, 511 U.S. at 834; Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997)). Under these circumstances, "[i]t is not sufficient that the official should have known of the risk." Id. (citing Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001)). "[T]he prison official-defendant must actually have known or been aware of the excessive risk to inmate safety" and disregarded it. See id. (quoting Beers-Capitol, 256 F.3d at 125). "For purposes of summary judgment, it is incumbent upon the plaintiff to marshal evidence sufficient to raise the inference that a prison official 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" Counterman v. Warren Cty. Corr. Facility, 176 F. App'x 234, 238 (3d Cir. 2006) (quoting Farmer, 511 U.S. at 846).

## III.   Plaintiff has failed to show that any of the Defendants were deliberately indifferent to his safety.

Plaintiff concedes that he did not raise any concerns with any of the Defendants—or any other member of the prison staff—about Longenecker prior to the October 25, 2012 incident.[7] He also concedes Longenecker had never before threatened him with physical harm.[8] Nonetheless, he contends that the prison official defendants knew that Longenecker had a history of violent behavior but did nothing to prevent Longenecker from harming him.

---

[7]     See Pl. Resp. to Defs. Facts ¶¶ 27-28; Br. Supp. Pl.'s Resp. to Defs.' Mot. 3, ECF No. 16 [hereinafter "Pl.'s Br."].

[8]     See Pl. Resp. to Defs. Facts ¶ 3.

Plaintiff testified at his deposition that at some time during 2012, a prison guard mentioned to him that "Longenecker gave [the guard] problems" and "wouldn't listen to him and other prison staff." See Pl. Dep. 15:4-16:25, Defs.' Facts Ex. A, ECF No. 15-1. Defendant Arnold, the Deputy Warden, testified that he "remember[ed] hearing [Longenecker's] name as being associated with incidents" involving threats toward prison staff members, but he did not express any particular concerns about Longenecker, stating that "inmates threaten staff at times" and suggesting that if he was in the position of a corrections officer, he would not be "overly concerned with this guy." See Arnold Dep. 30:19-31:12, Pl.'s Resp. to Defs.' Facts Ex. B, ECF No. 16-1. Defendant Clary, the prison counselor, recalled one incident where Longenecker failed to secure his cell at a designated time, but she testified that she was not aware that Longenecker had any particular reputation, other than what she learned from speaking with Plaintiff after Longenecker attacked him.[9] See Clary Dep. 31:8-20, 32:9-19, Pl.'s Resp. to Defs' Facts Ex. D, ECF No. 16-2.

Plaintiff also points to two prison reports documenting Longenecker's interactions with prison staff members. One, a "Misconduct Report," recounts an incident in August 2012 where Longenecker allegedly called a correctional officer an "asshole," a "dick head," and a "fagot" after the officer confiscated one of Longenecker's blankets[10] and told the officer, "I will punch you in the mouth when the door comes open." Pl.'s Resp. to Defs.' Facts Ex. C, at 1, ECF No.

---

[9]      While Defendant Clary testified that she could not recall precisely when Plaintiff spoke to her about Longenecker, see Clary Dep. 32:20-33:3, Plaintiff concedes that the first time he complained to anyone about Longenecker was in November 2012, after Longenecker had attacked him. See Pl. Resp. to Defs. Facts ¶ 28. Plaintiff also testified, contrary to Defendant Clary's testimony, that she believed that "Matthew Longenecker was violent" and a "troublemaker." See Pl. Dep 15:7-19. Plaintiff's testimony, however, does not indicate whether Defendant Clary told him that before or after the attack. But even if Defendant Clary believed that Longenecker was a violent inmate, that alone does not suggest that she was deliberately indifferent to a serious risk to Plaintiff's safety, because, as will be seen later in this Memorandum Opinion, "the risk that an inmate with some history of violence might attack another inmate for an unknown reason . . . is too speculative to give rise to an Eighth Amendment claim." Blackstone v. Thompson, 568 F. App'x 82, 84 (3d Cir. 2014) (citing Bistrian, 696 F.3d at 371).

[10]      According to the report, an inmate is only permitted to have one blanket.

16-2. The other, from May 2012, recounts an incident where Longenecker issued a veiled threat to a correctional officer after the officer refused to change the channel on a television, by "inviting [the officer] into his cell" and saying to the officer that he "'doesn't care' because [he is] going 'upstate.'" Id. at 5.

This evidence suggests that if Longenecker posed a threat to any personnel at the prison, it was to the correctional officers, not his fellow inmates, and does not show that any of the Defendants believed that he posed a substantial risk of serious harm to any personnel at the prison, whether prison staff, or other inmates, or Plaintiff. At most, this evidence may show that some of the Defendants were aware that Longenecker had a history of antagonizing the correctional officers and of insubordination. But even if this evidence could suggest, as Plaintiff urges, that Longenecker had a history of violence, that fact alone would not permit a jury to conclude that any of the Defendants believed that Plaintiff "was incarcerated under conditions posing a substantial risk of serious harm" merely because he was housed in the same cellblock as Longenecker, see Bistrian, 696 F.3d at 367, because "the risk that an inmate with some history of violence might attack another inmate for an unknown reason . . . is too speculative to give rise to an Eighth Amendment claim." Blackstone v. Thompson, 568 F. App'x 82, 84 (3d Cir. 2014) (citing Bistrian, 696 F.3d at 371).

Plaintiff also makes a passing reference to the fact that Longenecker self-identifies as a member of the "Crip Crime Family" and as a Wiccan/Pagan, and that he previously complained to prison officials about having to share his cell with Christian inmates, which he found to be a "conflict of interest" with his Wiccan/Pagan beliefs.[11] See Pl.'s Resp. to Defs.' Facts Ex. C, at 2-

---

[11]     Longenecker's religious beliefs may not have been the primary motivation behind his request for a spiritually-aligned cellmate. On the form he submitted to the prison officials, he wrote: "I keep getting [Christians] as a celly and I'm a Wiccan/Pagion[.] It is causing problems because it is a conflict of [interest.] Can my pagin

3. But Plaintiff has produced no evidence to suggest that the attack was motivated by Longenecker's gang affiliation or Plaintiff's religious beliefs; the attack appears to have resulted from prison gossip. Nor has Plaintiff produced any evidence to suggest that Longenecker had any history of violence tied to his gang affiliation or religious beliefs or that any of the Defendants would have had reason to believe that those attributes meant that he was predisposed for violence. As Defendant Clary testified, the mere fact that a particular inmate may identify with a gang "doesn't mean that they're creating problems in the prison." See Clary Dep. 29:18-22. Jamerson Lewis, a former correctional officer at the prison, testified that while he was cautioned by his supervisors to "look out" for gangs in the prison, he did not learn of any during his time there. See Lewis Dep. 28:6-13, Defs.' Facts Ex. F, ECF No. 15-2. Defendant Arnold testified that he was "not specifically aware" of any fights attributable to differences over religious beliefs or ethnicities. See Arnold Dep. 23:23-24:7.

While Plaintiff concedes that he did not express any concerns about Longenecker to the prison staff prior to the attack, he does contend that he approached Defendant Arnold at some time prior to the attack to tell him that he "was being harassed and threatened," that he "did not feel safe" because "there was fighting and too much stuff going on," and that "other people . . . were being harassed, [and] people [were] stealing and not feeling safe." Pl. Aff., Pl.'s Resp. to Defs.' Facts Ex. F, ECF No. 16-3. But this single complaint to Defendant Arnold, with only vague references to "harassment" and "threats" devoid of any specific information about any particular threat, is not sufficient for a jury to find that he, or any of the other Defendants, knew that Plaintiff was facing an "objectively intolerable risk of harm." See Jones v. Beard, 145 F. App'x 743, 745 (3d Cir. 2005) (affirming a grant of summary judgment to prison guards where

---

buddy move in to my cell so that there is no issue on religious[] [beliefs]." See Pl.'s Resp. to Defs.' Facts Ex. C, at 2.

"the record [was] devoid of evidence establishing that [the plaintiff] articulated specific threats

of serious harm, or that he made multiple complaints about [another inmate] to any one guard").

This "type of 'out-of-the-blue and unadorned "I'm-in-trouble" entreaty' that is commonly faced

by officials, who are charged with the 'arduous' task of managing an inmate population while

protecting those in custody," see Blackstone, 568 F. App'x 82, 84 (3d Cir. 2014) (citation

omitted) (quoting Bistrian, 696 F.3d at 369-70; Young v. Quinlan, 960 F.2d 351, 363 n.23 (3d

Cir. 1992), superceded on other grounds by statute, Prison Litigation Reform Act of 1996, Pub.

L. No. 104-134, 110 Stat. 1321, as recognized in Nyhuis v. Reno, 204 F.3d 65, 71 n.7 (3d Cir.

2000)), is too vague to impute such knowledge to any of the Defendants in light of the fact that

"threats between inmates are common," see Jones, 145 F. App'x at 746 (quoting Jackson v.

Everett, 140 F.3d 1149, 1152 (8th Cir. 1998)).

      Plaintiff also contends that the prison had a policy that prohibited inmates from entering

the cells of other inmates but did not enforce it, which would have prevented the attack.[12]

Initially, the evidence suggests that there is some dispute over whether such a policy in fact

existed. Mr. Lewis, the former correctional officer, testified that inmates were not to enter other

inmates' cells, see Lewis Dep. 28:14-16, and Defendant Clary, the prison counselor, also

testified that inmates were "not supposed to" do so. See Clary Dep. 30:22-24. However,

Defendant Arnold, the Deputy Warden, testified that he could not recall "any specific prohibition

about going in another cell," see Arnold Dep. 40:23-41:9. If this policy did exist, the evidence

suggests that there was a period of time during which the policy was not actively enforced,

followed by a "crackdown" of sorts at some time between 2011 and 2013 when the prison

officials began to strictly enforce the policy. Mr. Lewis testified that "there was time when

---

[12]    Which Defendants Plaintiff does not say, but presumably he assigns responsibility either to Defendant
Molyneaux, the Warden, or to Defendant Arnold, the Deputy Warden.

people would go sit in other people's cells and talk and—buddies, I guess, is what they were. And then there came a time when nobody, absolutely nobody was allowed to go in anybody's cell whatsoever . . . [b]ecause fights were happening." Lewis Dep. 28:22-29:7. He testified that prior to that time, however, fights would "[n]ot usually" occur when inmates were permitted to enter other inmates' cells. Lewis Dep. 28:20-22. Similarly, Defendant Clary testified that when the policy was not enforced, inmates would enter other cells to "play cards or get a cup of coffee from someone." Clary Dep. 30:22-31:3.

This evidence does not tell the tale of deliberate indifference. Rather, the evidence suggests that once prison officials learned that allowing inmates to enter other cells was creating a risk of harm, they acted to protect the inmates from the risk by "crack[ing] down" on the practice. See Lewis Dep. 30:8-12. Plaintiff has not produced evidence to show whether his attack occurred before or after this change in enforcement, but under neither scenario has Plaintiff produced evidence from which a jury could find deliberate indifference. If the attack occurred during the time that the policy was not being enforced, Defendants would have been deliberately indifferent only if they knew, at that time, that "[the] failure to follow prison polic[y] created a substantial risk of serious harm." See Bracey v. Pa. Dep't of Corr., 571 F. App'x 75, 79 (3d Cir. 2014). The mere fact that the prison officials were not enforcing the policy during a certain period of time is not sufficient for liability, because "a violation of prison policy 'is insufficient by itself to support an argument for deliberate indifference.'" See id. (quoting Longoria v. Texas, 473 F.3d 586, 593 n.9 (5th Cir. 2006)). Plaintiff has produced no evidence to show that at the time the policy was not being enforced, prison officials were aware that failing to enforce the policy would create a substantial risk of serious harm. Rather, Mr. Lewis testified that the reason the policy existed was to prevent inmates from "steal[ing] like [other inmates'] commissary and

things like that," Lewis Dep. 28:14-19, not because of any history of violence, and his recollection that fights were not a usual occurrence during the time that the policy was not being enforced suggests that prison officials were not, at that time, "unreasonably disregarding an objectively intolerable risk of harm." See Farmer, 511 U.S. at 846.

If, instead, the attack occurred during the time when "nobody was allowed to go in anybody's cell whatsoever," Lewis Dep. 28:22-29:3, the fact that Longenecker was nonetheless able to enter Plaintiff's cell suggests, at most, negligence. Mr. Lewis's testimony—the only evidence on the subject—establishes that once prison officials learned that fights were occurring, they no longer allowed inmates to enter other inmates' cells. That they may have been unable to stop Longenecker from doing so does not mean, without more, that any of the Defendants were deliberately indifferent to Plaintiff's safety, because "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm was not averted." Farmer, 511 U.S. at 844. Evidence that the prison officials continued to allow inmates to enter other inmates' cells after learning of the spate of fights that occurred could be probative of liability, but the evidence Plaintiff has produced reveals the opposite. Under neither scenario has Plaintiff produced evidence to create a genuine dispute that Defendants' enforcement (or lack thereof) of this policy constituted a deliberate indifference to his safety.

Finally, Plaintiff contends that the prison was generally a "hostile environment."[13] He points to the testimony of Defendant Clary, who, when asked if, "at times the environment within the prison would sometimes be hostile for an inmate," responded, "Sure." Clary Dep. 46:25-47:9. But "[t]he Constitution 'does not mandate comfortable prisons,'" which "may be 'restrictive and even harsh.'" Farmer, 511 U.S. at 832-33 (quoting Rhodes, 452 U.S. at 347,

---

[13]     See Pl.'s Br. 15-16.

349). Prison officials have the "unenviable task of keeping dangerous men in safe custody under humane conditions," id. at 844-45 (quoting Spain v. Procunier, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.)), and the Eighth Amendment does not require prison officials to root out all hostility from inside prison walls. "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course," id. at 833, but the evidence Plaintiff has produced does not suggest that anything of the sort was occurring at the Lancaster County Prison. Defendant Clary testified that inmates "rarely" expressed any fears to her of being in prison, either with respect to other inmates or to the guards,[14] and over her nearly twenty years at the prison, she recalled witnessing only one fight between inmates approximately ten years ago, Clary Dep. 16:9-16, 18:19-25, while Mr. Lewis opined that a "bad month" at the prison might involve two or three inmate fights. Lewis Dep. 26:21-27:11. A former inmate, who was incarcerated at the prison in 2012, testified that he "never felt threatened or bullied or assaulted during those times" and witnessed only one fight over a three-year period that he was incarcerated. See Spedden Dep. 21:18-22, 35:19-24, Defs.' Facts Ex. G, ECF No. 15-3. From this evidence, no reasonable jury could find that any of the Defendants allowed the inmates to be subjected to an "excessive risk to [their] safety." See Bistrian, 696 F.3d at 367 (quoting Beers-Capitol, 256 F.3d at 125).[15]

---

[14]      Defendant Clary did suggest, however, that inmates may be reluctant to report fights with other inmates to members of the prison staff. See Clary Dep. 17:2-7. But Plaintiff has not produced other evidence to suggest that inmate violence posed a substantial risk of serious harm and that prison officials were indifferent to that risk.

[15]      Plaintiff also contends that Defendants "placed [him] at an increased risk of [harm] by putting him in the drug and alcohol block, a more violent and hostile area, even though he did not have a drug charge." Pl.'s Br. 2. Initially, it is not clear from the evidence Plaintiff has produced that this part of the prison was "more violent and hostile" than any other part. Plaintiff makes much of the testimony of Defendant Clary, who, when asked if any inmates expressed concerns to her that the prison was a "hostile environment" or "dangerous," explained that inmates would do so "[m]ore on the drug and alcohol block because we have a—it's a positive recovery environment if someone's a problem." Clary Dep. 48:4-12. Plaintiff interprets this statement to mean that the drug and alcohol block was more violent than other parts of the prison, but a better interpretation may be that inmates housed in that part of the prison were simply more likely to report concerns about harassment or threatening behavior because they sought to maintain a positive environment for drug and alcohol treatment. Regardless,

## IV.    Conclusion

Plaintiff has failed to produce evidence sufficient to create a genuine dispute that any of the individual Defendants were deliberately indifferent to any substantial risk of serious harm, which means that they are entitled to summary judgment. Since each of the individual Defendants is entitled to summary judgment, Plaintiff's claim against the Lancaster County Prison Board for maintaining "a policy or course of conduct"[16] that contributed to the violation of his Eighth Amendment rights also fails under these circumstances. See Grazier ex rel. White v. City of Phila., 328 F.3d 120, 125 & n.5 (3d Cir. 2003); Randall v. County of Berks, Pa., No. 14-5091, 2015 WL 5027542, at *12 (E.D. Pa. Aug. 24, 2015). An appropriate order follows.


BY THE COURT:


/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge

---

Plaintiff testified that he was not moved to the drug and alcohol block until after he was attacked by Longenecker. See Pl. Dep. 16:1-11, 23:10-11, 31:8-32:15.

[16]      See Compl. ¶ 27(h)-(j).